nter. Good morning. My name is Jeffrey Vitt. I represent the plaintiff, Dr. Misty Blanchette Porter. The record in this case establishes that her employment was terminated for two reasons. One, her perceived disability. And two, her whistleblowing activities. We submitted to the trial court affidavits from other doctors and nurses who had worked with Dr. Porter, deposition testimony, and as you would expect, a volume of internal e-mails among Dartmouth-Hitchcock management. If the evidence is considered as a whole and not piece by piece, and all reasonable inferences are drawn in favor of Dr. Porter, the lower court decision would be reversed and this case should be decided by a jury. In order to assess what the actual reasons were for Dr. Porter's termination, we suggest that the court ask three questions. One, what were Dr. Porter's duties when she was terminated? Two, what do e-mails among senior management reveal about why Dr. Porter could not remain an employee? And three, what was the explanation provided by management when they were asked directly, why is Dr. Porter being terminated? Her job duties. At the time of the termination, she was doing little reproductive endocrinology work. Her work was principally in the OBGYN department doing two things. She was handling surgery that no other doctor at Dartmouth-Hitchcock was capable of performing. Two affidavits established that. And when she left, those cases had to be referred to other hospitals. And second, she was helping with the reading of ultrasounds. Dr. Porter has an international reputation in this field, and the affidavits reflect that the entire department relied upon that expertise. Nurse Parent said that literally there would be lines of doctors outside the office asking for her assistance in reading ultrasounds, particularly those in the first trimester. Well, it's undisputed that her part of the department, her division, was closed. And there is substantial evidence in the record that Dr. DeMars did her best to find an alternate role for Dr. Porter, but was unable to. No, I don't agree with that. Am I misunderstanding the record? Well, all that Dr. DeMars did was go to the radiology people and say, can she help out? She was already working in the OBGYN department. They were already relying upon her expertise on a regular basis. And if you look at the e-mails, which I'll get to in a moment, between Dr. DeMars and Dr. Marans, Dr. DeMars is saying, she's not the surgeon she used to be. I don't think she'll ever be able to do it again. You're shifting now to the disability point. That's fine, I mean, if you want to do that. I think that the question the presiding judge was asking had to do with the closing of the REI and whether that was the ultimate reason for her discharge on that side of it, on the so-called whistleblowing problem. After the decision was made to close the REI division, there was a spreadsheet put together about where the doctors were going to go, what was going to happen to these people. One person was repositioned from the REI division to OBGYN. That was Todd. Dr. Porter's, what was shown originally was that she would be repositioned from the REI division to the OBGYN department. That was later changed. There was nothing inevitable about the decision. When they decided to close the REI division, the other two doctors didn't have any other skills, frankly. There's nothing else they could do. But Dr. Porter wasn't principally an REI doctor at the time. She might have been assigned to that division, but she was doing OBGYN work at an extremely high level. Work that everybody in the division says we relied upon her. We didn't have anyone else who could do the work that she did. Could you address the absence of evidence that Dr. Behrens knew about the whistleblowing and why that is not fatal to your argument here? Sorry, I'll speak up. I keep encouraging other people too, and I forget myself sometimes. As I understand the record, there's no evidence that Dr. Behrens even knew about the whistleblowing. The district court concludes there's insufficient evidence of pretext here.  If you look at the e-mails between Dr. Behrens and Dr. Porter, we cite them. I don't have the appendix. I do. Joint appendix 644 to 46. There's an extensive e-mail exchange between the two of them, between Dr. DeMars and Dr. Behrens. And Dr. DeMars is saying that essentially Dr. Porter is a pain in the neck. She actually writes that essentially the only way we could keep her, this is Dr. DeMars now, is to put her into a box enough to keep her from being disruptive. And then she says she is unwilling to be a worker bee. She certainly is not using the term whistleblower, and you wouldn't expect that she would. But what she is saying is that Dr. Porter has been a pain in my neck. Every time there's a problem, every time there's essentially malpractice, she won't be quiet about it. When the doctor performs tubal pain. That's not self-evident as an impermissible reason on its face. I mean, there may be whistleblowing involved. I'm not gainsigning that. But if a person is an extraordinarily difficult employee for whatever reason, that doesn't mean necessarily that their determination of that person is for a protected reason. I'm seeing my time. Is that my answer to that question? Yeah. I agree with you entirely. If a person is a difficult employee and is hard to work with, you can terminate them. The evidence before this court is that Dr. Porter was anything but that. When Dr. Sue was hired, she figured out quickly that he did not have the experience necessary to do the job. So for six months, she voluntarily took weekend call with him to train him. She wasn't paid for it. It wasn't a request. And if you look at the affidavits from the doctors, Dr. McCallum, Dr. Russell, they describe an extraordinary colleague who goes out of her way to help and to help train people. Whatever Dr. Porter is, she was not a difficult colleague. She had standards. She expected competence, but she was not a difficult colleague. Could you tell me what you point to as evidence that she was terminated because of her disability? Her disability? Yes. Yes. If you look at the e-mail exchange between Dr. DeMars and Dr. Marans, the issue that they're focusing on is why can't Misty Porter remain an employee? So what does Dr. DeMars say? One, everybody remembers Misty Porter when she could perform with three hats. Now I don't think she will ever be capable of doing those complicated surgeries that she could do before. The focus is on there's no use for her. And when Ed Marans is asked, not in some stray, you know, not running down the hall, but in an OBGYN department-wide meeting, he must have known that he was going to get a question about Dr. Porter's firing. And he got the question from Dr. Russell. I can understand why the other two were fired, but why Misty? And the words out of his mouth was she was on disability. A week before that, a nurse had written to him and said, we need her in OBGYN. She is essential to our performing. And he writes back and says, well, she's only working 20% of the time. I mean, he was off. Actually, it was 50%. But what does he focus on? He was saying she's disabled, and I'm not even sure she wants to stay. Nobody ever asked her. But those e-mails. Are these the same e-mails you referred to before? Well, the one between DeMars and Marans I referred to, and then the other e-mails which we referred to in our brief was from Victoria Maxwell, the nurse. Do you have the record sites for those e-mails? It's not the 644 to 646, is it? Those are the e-mails between Dr. Marans and Dr. DeMars. Victoria Maxwell, if I can stand up again in a minute. I say I've got 340. Am I still on for 340? No, I think that your time has expired. I thought. But if you were offering to find the sites while you're sitting down, that would be very helpful. Thank you. Good morning, Your Honor. Donald Schroeder and Jessica Joseph on behalf of the Dartmouth-Hitchcock entities who are the appellees in this case. At its core, this employment case is unremarkable. Dr. Porter weaves a nice story, casting herself as a victim, but the record does not contain any facts, actual facts to support her theories, opinions, speculation, or what I call triple hearsay. There are no citations to the record or citations that are cited do not reflect what was asserted by Dr. Porter. As an initial matter, no one questions Dr. Porter's credentials, expertise, record of accomplishments. Yet that status does not make her immune from legitimate business decisions by her former employer. And in fact, the court has already latched on to a couple of what are clear, undisputed facts. Number one, the REI Division, the Reproductive Endocrinology and Infertility Division of Dartmouth-Hitchcock, was closed in early May 2017. And chronology here is important because we can get to the JA 644 to 646 in a minute. The announcement actually happened on May 4th. This was not a whimsical decision. In fact, no one can recall any other instances where that had happened. In fact, Dartmouth-Hitchcock, and this is back in 2017, has still not reopened the REI Division since that time. What is another clear fact is that this REI Division had three doctors, Dr. Sue, Dr. Porter, and Dr. Seifer. Dr. Seifer was the Division Director, so Dr. Porter's boss. All three physicians were terminated as a result of the REI closure approximately one month later in early June. Another key fact, Your Honor, latched on to as well, is that Dartmouth-Hitchcock's Chief Clinical Officer, Dr. Ed Marans, was the ultimate decision-maker on the REI closure and did not know anything about any complaints that Dr. Porter had made over a series of years. Everybody that has testified, Mr. Herrick, who was the VP of Perioperative and Surgical Services, Dr. Marans, Dr. DeMars, all of them corroborated the fact that this was Ed Marans' decision as the Chief Clinical Officer. He made the call, he himself. Number three, Dr. Marans had no knowledge. How long had he been Chief Medical Officer? I believe, Judge Kearse, a couple of years. He was the Chief Clinical Officer, and he'd been there for, I believe, over 20 years at that point, perhaps 25. With respect to the knowledge of Dr. Marans, he did not know anything about her trail of internal complaints or the specific nature of her disability. My appellant's counsel referenced the fact that at one point Mr. Marans said to an audience that she was on disability. In fact, at that point, she was on long-term disability. In fact, she was on long-term disability. Well, nobody's questioning the reality of that. The only question is whether there's sufficient evidence of the possibility of a disability being one of the reasons that would require this case to go to a fact-finder. Could what happened, all this evidence about disability that was pointed out by your adversary, is that sufficient to overcome the summary judgment trial? Grant. I understood, Your Honor. And with respect to Dr. Porter's status, she'd been on and off disability. This wasn't something that just happened right before the decision to... But it's really a question of what a fact-finder would, how a fact-finder might reach a conclusion. Certainly might reach the same conclusion that you're arguing. Well... Maybe not. Well, except for the fact that, Your Honor, at the end of the day, what happened was they closed the entire division. And one of the other undisputed facts is at that time, and the record reflects this with respect to the closure of the REI division... Well, I don't want to merge the two. The two were separated properly, I think, in terms of analysis by your adversary. That might not go to the whistleblowing point, but it might also go to the fact that they didn't want to find another job for her. Let me correct the record on that, Your Honor, with respect to that point. At the time, there's no dispute that Dr. Porter had been given, authorized, approved by Dr. DeMars, all the reasonable accommodations she sought. And at that point in time, she was working around part-time. She was still collecting LTD benefits, and I'm talking about the time of the REI division closure. But the fact that Dr. Marans knew that she was on disability at the time of that discussion later on, there's no evidence in the record that he used that status of her being on disability. He didn't know anything about her accommodations. He oversees 1,500 physicians, and so he's testified, I didn't know anything about her status at that point or how many hours she was working. With respect to your point, though, about, well, what about after the fact? Up until that time, she'd been given upwards of 11 different reasonable accommodations. And she said in her complaint, JA-18, that, in fact, with all the reasonable accommodations, I was able to do my job and perform the essential functions of my job. However, when it comes down to what was going to happen after the fact, the record is clear that Dr. DeMars made a series of efforts, and it's supported by Mr. Herrick, among others, that she went to the head of radiology, because that was one thing that Dr. Porter had been doing, these ultrasound, gynecological ultrasounds at that point. Went to the radiology department, and it's undisputed by her affidavit, Jocelyn Chertoff, that, in fact, there was no need to add another person to do ultrasounds at that point, that they had more than enough radiologists. And, in fact, at that point, there was, they never had anybody on a part-time status, which she was on at that point, to actually perform the ultrasounds. So there was no position that, and under the law, state and federal law, there's no duty to create a new position for somebody, because that's really what would have been required here at the end of the day. With respect to the closure, and just going back to that issue for a second, the REI division closure was precipitated, or I should say the driving force, was the fact that there was only one nurse left standing at that point. Casey Dodge had been terminated. Sharon Parent, who was referred to by appellant's counsel, had retired in December of 2016, in a very short time period. December 2016 up to April of 2017, a series of nurses had left. So there was only one less than fully trained REI nurse, and this is a very specialized area. Very hard to recruit for, but it's also very hard, it's not something that you just say, okay, I'm going to hire a nurse and she can handle, or he can handle REI functions. You have to actually have specialized training in order to do it. At the end of April, by the end of April, there was no one left standing other than this one nurse. And three other undisputed facts relating to the state of affairs in the REI division. Number one, in early December, they'd already started moving back dates for patients a couple of months, because they just didn't have the resources. They didn't have enough REI nurses to handle that. Number two, they also put in place hiatus on any new patients. And number three, in January and February of 2017, members of that department participated in what's called the DH Value Institute, and it was more of a retreat because there were issues with complaints, there were issues with patient satisfaction. This was to work on teamwork and communication. It was a mini-retreat. All those things happened in that time frame. And by April, there was only one nurse left standing in that department. And Dr. Marans, based largely on that being the driving force at that point, but also certainly commentary about the fact that there had been dysfunction in the group, and just to address the dysfunction in the group, at no point does Dr. Marans ever point the finger and say, well, it's Dr. Porter. He basically casts a pox on all their houses, everybody, all three physicians and staff in that department. He's never at any point in any of those e-mail communications, which happen about 10 to 12 days after the announcement of the decision is made, does anybody say, you know, is there anything in that regard? So with respect to ‑‑ Well, doesn't Dr. DeMars single out Porter as being a cause of the dysfunction? You're right, Your Honor. I think two weeks later, she does, in fact, do that. But I think what you have to come back to is Dr. DeMars didn't make the decision to close the facility, and she didn't have the ability to do that. She, in fact, testified, you know, it was out of my hands. And, in fact, despite her comments ‑‑ But she did convey those views to Dr. Marans, though, didn't she? You're right, Judge Kares. But all of her actions leading up until that comment, after the announcement had been made, had all been attempting to find a way to keep her on board. There's no question that they were close friends. The amended complaint says that, in fact, and that is the story that Dr. Porter initially weaves. But then she sees these post‑announcement e‑mails, and now it's, well, she must be my ‑‑ she's no longer my ally. She's the villain. However, if you look at all of her actions, Dr. DeMars' actions, every single action which is corroborated by other individuals is the fact that they have all said that she was always trying to find a job for her. She was trying to find a way to keep her on board. And, in fact, she did, in fact, go to the head of the radiology department. And it's undisputed that Jocelyn Chertoff testified by affidavit that there was no position available for her. Thank you, Your Honor. The reference that I was looking for, it's Joint Appendix 648. That's Nurse Maxwell writing to Marins saying, we need her, can't we please keep her? And he writes back and says, essentially, she's not working full time. Dr. Marins was asked in the meeting, why can't Dr. Porter stay? And his response was, she's on disability. If we are entitled to all reasonable inferences, we should believe that Dr. Marins meant what he said. Now, you could come up with explanations. I mean, there are some explanations I suppose they could try. But that's an issue that should go to a jury, not the judge on a summary judgment motion. And I have a little bit of time. This notion that Leslie DeMars is the best friend of Misty Porter, the record does not reflect that. Look at that e-mail, among other things, the one that I referred before. Those are not words of a friend. And at the same time, she is writing to somebody else, the general counsel, I believe, saying my life and the messaging would be a lot easier if Dr. Porter were facing a loss of her license. Those are not comments that someone makes about a friend. Thank you. Thank you both, and we will take the matter under advisement. Thank you.